UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTERN MATERIALS CORPORATION, ISLAND EXTERIOR FABRICATORS LLC, | Case No.: 2-17-cv-01034-ADS-AYS |
| *Plaintiffs,* | **SECOND AMENDED COMPLAINT** |
| -against- | |
| MITSUBISHI PLASTICS COMPOSITES AMERICA, INC. | |
| *Defendant.* | |

The plaintiffs, EASTERN MATERIALS CORPORATION and ISLAND EXTERIOR FABRICATORS LLC, by their attorneys, LEWIS JOHS AVALLONE AVILES, LLP, complaining of the defendant, MITSUBISHI PLASTICS COMPOSITES AMERICA, INC, respectfully alleges upon information and belief as follows:

**THE PARTIES**

1.       Plaintiff, EASTERN MATERIALS CORPORATION (hereinafter "EASTERN") is a domestic business corporation which maintains a principal place of business at 1101 Scott Avenue, Calverton, New York.

2.       EASTERN is regularly engaged by builders and contractors to supply building materials for buildings and other large scale projects on the eastern seaboard, including but not limited to New York City.

3.       ISLAND EXTERIOR FABRICATORS LLC (hereinafter ISLAND) is a domestic limited liability company which maintains a principal place of business at 1101 Scott Avenue Calverton NY.

4.      ISLAND is regularly engaged by property owners, builders, construction managers, and architects as a fabricator to produce facades, known as "exterior enclosures," for buildings and other large scale projects using a wide variety of materials and designs.

5.      Upon information and belief, Defendant, MITSUBISHI PLASTICS COMPOSITES AMERICA, INC. (hereinafter "MITSUBISHI"), is a foreign corporation organized and existing under the laws of the State of Delaware, doing business and regularly transacting business within New York State. According to the website of the Delaware Department of State, its registered agent for the service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

6.      Upon information and belief, MITSUBISHI is regularly engaged in the providing of engineering, design, and related architectural materials and services for purchasers and clients within the State of New York.

7.      Upon information and belief, MITSUBISHI is regularly engaged in the manufacture and distribution of metal and aluminum composite materials, including ALPOLIC® composite panels, and regularly solicits, distributes, and delivers the ALPOLIC® panels in the State of New York deriving substantial revenue therefrom.

**THE ESSEX STREET PROJECT AND THE PARTIES'
AGREEMENT AND WARRANTY FOR MATERIALS**

8.      In 2015, ISLAND was retained, pursuant to a Subcontractor Agreement, by Construction Manager, T.G. Nickel & Associates, LLC (hereinafter "Nickel") for a project known as Essex Crossing located at 115 Delancey Street, New York, New York (hereinafter the "Project"). The Project is a 1.65 million square foot mixed-use development which will include housing for low, moderate, and middle income households and senior citizens, and a mix of

retail, residential, entertainment, and office space. (Subcontract Agreement annexed hereto as Exhibit A)

9. Pursuant to its Subcontractor Agreement with Nickel, ISLAND agreed to furnish and provide the necessary labor, materials, and equipment for the fabrication, supply, installation, coordination, and engineering of the exterior enclosure systems (facade) and associated components for the Project.

10. To execute its obligations under the Subcontractor Agreement, ISLAND engaged EASTERN to obtain estimates from suppliers for aluminum composite material ("ACM") panels or sheets[1] for the exterior enclosure system for the Project compliant with the specifications issued by Project Architect, Handel Architects, LLP ("Project Architect").

11. In or about October 2015, MITSUBISHI was provided the relevant Project specifications issued by the Project Architect, and thereafter submitted samples of the ALPOLIC® materials for the approval of EASTERN and the Project Architect.

12. Over the ensuing weeks, the parties' discussions centered upon MITSUBISHI's ability to deliver the finish, coating and color match required by the Project Specifications.

13. On November 11, 2015, MITSUBISHI quoted Eastern a price of $3.50 per sq. ft. for 170,000 square feet of 4 mm FR Core 3 coat custom metallic sheets that were represented to be compliant with the specifications issued by the Project Architect.

14. On November 12, 2015, the Project Architect expressed his approval of the ALPOLIC® samples provided by MITSUBISHI via correspondence to ISLAND.

---

[1] Units of the ACM material are alternately referred to as "panels" or "sheets" in Mitsubishi's published materials. This nomenclature becomes somewhat confusing, however, because an assembled unit for building's façade, which is comprised of multiple ACM sheets or panels, is also referred to as a "panel" or "Mega Panel." To try to distinguish between the two items in this pleading, where possible we will refer to the unassembled products received from Mitsubishi as "sheets," and the assembled product as "panels."

15.    Also on November 12, 2015, ISLAND communicated the Project Architect's approval of the ALPOLIC® samples to MITSUBISHI.

16.    Following the approval of the initial samples, the review process moved into a second phase with ISLAND constructing a full-size Visual Mock Up and Performance Mock Up of the building's façade, so that the Project Architect could review, validate, and confirm/approve the previously approved color samples.

17.    To that end, via Purchase Order dated November 19, 2015, EASTERN ordered from MITSUBISHI full-scale versions of the composite sheets for which color samples had been previously provided, which sheets were to be used for a larger scale Visual Mock Up as requested by the Project Architect. (A copy of the Purchase Order for the Visual Mock Up materials is annexed hereto as Exhibit B.) Specifically, for the construction of the Visual Mock Up, MITSUBISHI provided:

A.    4mm FR Core ACM sheets – 439Z6254M (Kynar) Fluropon 11262 Metallic 430A307 basecoat, referred to as ALPOLIC® Anodized **BLACK**, 3-coat metallic Valspar finish; and

B.    4mm FR Core ACM sheets – 439Z6258M (Kynar) Fluropon 11263 Metallic 430A307 basecoat, referred to as ALPOLIC® Anodized **BRONZE** 3-coat metallic Valspar finish.

18.    EASTERN purchased the ACM sheets for the Visual Mock Up at a cost of approximately $9,000.00.

19.    The express purpose of the Visual Mock Up, which was known to MITSUBISHI, was to serve as a large scale sample (the "Sample Sheets") of the ACM sheets being contemplated for purchase by EASTERN from MITSUBISHI for implementation into the

Project, so that the Project Architect could view and approve the Sample Sheets in a large format, fabricated state, prior to purchase, and in particular, the color and finish.

20.    MITSUBISHI represented that the sheets ordered by EASTERN for the Visual Mock Up were consistent with the specifications issued by the Project Architect.

21.    The Visual Mock Up was built, viewed and formally approved by the Project Architect.

22.    MITSUBISHI represented to EASTERN and ISLAND that it was capable of reliably reproducing Sheets for the Project that were consistent with the samples and Sample Sheets previously provided by MITSUBISHI, and delivering the expected color and finish consistency required for the Project.

23.    Based on the prior samples and Sample Sheets, and the foregoing representations by MITSUBISH that it could deliver the same color and finish consistency as the samples and Sample Sheets, EASTERN placed two Purchase Orders with MITSUBISHI dated June 1, 2016 (hereinafter "Purchase Orders"), for the identical materials used in the Visual Mock Up. Specifically, EASTERN ordered:

> A.    The quantity of 456, 4mm FR Core ACM sheets – 439Z6254M (Kynar) Fluropon 11262 Metallic 430A307 basecoat, referred to as ALPOLIC® Anodized **BLACK**, 3-coat metallic Valspar finish; and

> B.    The quantity of 2,915, 4mm FR Core ACM sheets – 439Z6258M (Kynar) Fluropon 11263 Metallic 430A307 basecoat, referred to as ALPOLIC® Anodized **BRONZE** 3-coat metallic Valspar finish.

(The June 1, 2016 Purchase Orders are annexed hereto as Exhibit C).

24.     Pursuant to the parties' agreement, as evidenced by the Purchase Orders, in exchange for the production and delivery of the agreed upon materials, MITSUBISHI was to be paid the sum of $575,986.58.

25.     Pursuant to the parties' agreement, as evidenced by the Purchase Orders, MITSUBISHI was to provide a 30-year "Finish warranty on Custom Metallic."

26.     Pursuant to the parties' agreement, as evidenced by the Purchase Orders, the Project Material was to be produced and painted in a single production run to ensure finish and color consistency, and delivered to Plaintiffs in phases, based on ISLAND's fabrication schedule.

27.     Specifically, pursuant to the Purchase Orders, the MITSUBISHI ALPOLIC® materials were to be delivered to the ISLAND facility in Calverton, New York commencing on July 6, 2016 and continuing through November 1, 2016.

28.     As such, at the time that EASTERN and MITSUBISHI entered into the contract, MITSUBISHI was aware of ISLAND's Subcontractor Agreement with Nickel, and more particularly, was aware of ISLAND's Project Schedule under the Subcontractor Agreement with Nickel and had agreed to provide the materials in accordance with that schedule.

29.     Accordingly, the delivery schedule that was agreed to between EASTERN and MITSUBISHI was designed to coincide with ISLAND's obligations under its Subcontractor Agreement with Nickel, so as to ensure its compliance with its contractual obligations.

30.     At the time when EASTERN and MITSUBISHI entered into the contract, MITSUBISHI knew that any failure to provide the exact materials specified and ordered by plaintiffs would delay the Project and proximately cause EASTERN and ISLAND to suffer direct and consequential damages, in the nature of loss of productivity, inefficiency, increased

overhead, additional manpower and overtime costs necessitated by efforts to mitigate damages by hitting Schedule milestones.

31.    At the time when EASTERN and MITSUBISHI entered into the contract, MITSUBISHI knew that any defect in, or issue arising from, the quality of the MITSUBISHI ALPOLIC® materials would delay the Project and proximately cause EASTERN and ISLAND to suffer direct and consequential damages, in the nature of loss of productivity, inefficiency, increased overhead, additional manpower and overtime costs necessitated by efforts to mitigate damages by hitting Schedule milestones.

32.    At the time when EASTERN and MITSUBISHI entered into the contract, both EASTERN and MITSUBISHI contemplated and understood that EASTERN would suffer direct and consequential damages if the sheets provided were not in conformity with the samples and Sample Sheets used in the VMU and approved by the Project Architect.

33.    The extent of the consequential damages that Plaintiffs would suffer, in the event that MITSUBISHI provided MITSUBISHI ALPOLIC® materials that deviated from the Sample Sheets, were foreseeable, particularly for a sophisticated company like MITSUBISHI, which upon information and belief, derives millions of dollars in annual revenues from its ALPOLIC® sales worldwide.

34.    At the time when EASTERN and MITSUBISH entered into the contract, MITSUBISHI was aware, from its discussions with EASTERN, from its actual knowledge of ISLAND's construction schedule obligations, and from its years in the industry, that it would be responsible for the consequential damages that ISLAND and EASTERN would suffer in the event of MITSUBISHI's breach.

35.     Delivery of the MITSUBISHI ALPOLIC® materials to ISLAND's facility in Calverton, New York commenced in July 2016.

36.     Upon commencement of delivery of the materials, MITSUBISHI also invoiced to EASTERN, and EASTERN paid to MITSUBISHI, the total sum of $163,187.00 as shipments were received.

37.     The MITSUBISHI ALPOLIC® materials delivered to ISLAND's Calverton facility were packaged in crates with an opaque, factory-applied protective film covering the finished surfaces and preventing visual inspection of the finish of the delivered sheets.

38.     The MITSUBISHI MANU-SPEC® document pertaining to ALPOLIC® Metal Wall Panels, retrieved from the MPCA website (and annexed hereto as Exhibit D) notes that MITSUBISHI applies a "heavy-duty removable plastic film during production" to "protect finish of panels," and advises that the protective film is to be removed "after installation of joint sealers and immediately prior to the completion of composite metal panel work."

39.     The ALPOLIC® and ALPOLIC®/fr catalogue, retrieved from the MPCA website (and annexed hereto as Exhibit E), advises "[t]he protective film on ALPOLIC™'s mostly consists of two polyethylene layers of white and black. *Do not peel off the protective film during fabrication and installation to protect the surface from scratching and soiling.* Under normal weather conditions, the protective film will withstand 6 ( six )-months of outdoor exposure without losing any of its original peel-off characteristics or causing stains or other damage. However, peel off the protective film as soon as possible *after completion*." (emphasis added).

40.     The ALPOLIC® Metallic Product Data Sheet, retrieved from the MPCA website (and annexed hereto as Exhibit F), advises that "Protective film should be removed from panels soon *after installation*." (emphasis added).

8

41.     The ALPOLIC® Fire Resistant ACM SPEC-DATA® Sheet, retrieved from the MPCA website (and annexed hereto as Exhibit G), states that the "[f]inish of panels is protected by heavy duty removable plastic film during production," and advises that the protective film should be removed "after installation of joint sealers and immediately prior to completion of composite metal panel work."

42.     The ALPOLIC® Technical Manual Excerpt, retrieved from the MPCA website (and annexed hereto as Exhibit H), advises that the panels' "topside is covered with a protective film" (pg. 2), and under the "General notes (Very important!)" section (pg. 14), states:

> The protective film on ALPOLICs consists of two polyethylene layers of white and black. *Do not peel off the protective film during fabrication and installation* to protect the surface from scratching and soiling. Under normal weather conditions, the protective film will withstand 6 (six)-months of outdoor exposure without losing any of its original peel-off characteristics or causing stains or other damage. However, peel off the protective film as soon as possible *after completion*.

(Emphasis added).

43.     Section 3 of the "Fabrication and Installation Guides," of the ALPOLIC® Technical Manual, obtained following an internet search for ALPOLIC® technical manuals (and annexed hereto as Exhibit I),[2] is published by MITSUBISHI for the express purpose of educating and instructing its customers on the proper handling and fabrication of its product. In it, MITSUBISHI repeatedly states that the protective film is to remain on the product throughout the fabrication process, e.g.:

> A. instructs not to use "adhesive tapes made of PVC (polyvinyl chloride) on the surface of protective film at any time during storage, fabrication or installation" of the product (pg. 34);

---

[2] Available at http://www.creativealuminium.co.uk/downloads/alpolic/Alpolic_Fabrication_Installation_Guides.pdf

B. instructs "[d]o the cutting operation with the external side facing upward to prevent the panel from scratches and the protective film from peeling off" (pg. 36; *see also* pg. 46 at fig. 3-27, item 10);

C. instructs to "[d]o the bending work without peeling off the protective film of ALPOLIC" (pg. 40);

D. advises that "[i]n tooling work of modified silicone and polyurethane sealant, do not smear the protective film of ALPOLIC with surplus sealant" (pg. 45).

44.     The APOLIC® "Fabrication Manual Painted ACM Pe and fr Core," retrieved from the MPCA website (and annexed hereto as Exhibit J), states:

A. "To prevent scratching, it is best to leave the factory applied protective film on the ALPOLIC® during processing."

B. "ALPOLIC® comes with a factory applied protective masking film which should be removed after fabrication."

45.     Further, it was, and remains, industry custom and practice to leave the factory-applied protective film affixed to the panels until *after* fabrication is completed to minimize and prevent damage to the painted finish. Indeed, there is no way known to Plaintiffs to remove the film for inspection and reapply prior to processing and fabrication; to do so would be to render the materials *unusable.*

46.     Upon receipt, and in accordance with the ALPOLIC® Fabrication Manual, MITSUBISHI's online materials, and industry custom, each shipment of material received from MITSUBISHI was promptly examined for quantity and observable damage, and remained crated until fabrication commenced, and protected by the film until fabrication was completed.

47.     In accordance with industry custom, the ALPOLIC® Fabrication Manual, and MITSUBISHI's online materials, and in order to protect the materials from breakage, scratching, blemishes or damage that would render the materials unsuitable for the Project, the factory-applied protective film affixed to the Sheets by MITSUBISHI remained in place during the fabrication process.

48.     Upon receipt of the necessary sheets and other components by EASTERN from MITSUBISHI, ISLAND began to fabricate and assemble the "Mega Panels" that would ultimately make up the façade of the Project building. That process is as follows: First, the ACM sheets, which are delivered in large (5' feet x 14 feet) sheets, are routed to the Computer Numerical Control router ("CNC") and cut based upon the engineered profile. The "flat cut" ACM profiles are then transported to the Folding/Assembly Department, where the Fabrication Crew assembles them into ACM "pans." This involves taking the CNC cut sheets, placing them on flat folding tables, and with the help of aluminum extrusions, rivets, and adhesives, turning the flat CNC cut sheet into a manufactured ACM "pan." The work completed on the ACM folding table is performed from the back of the ACM sheet; the ACM finish is face down on the table the entire time the sheets are folded, and the protective film is critical to protecting the finished surface from damage. Once folded, the pans are crated and transported to a Mega Panel Finish Shop, where they are held in storage until all of the pans in a particular production phase are finished and ready to be installed. Once all of the pans are available, a "Mega Panel System" is assembled by using hundreds of different materials, parts, and assemblies that comprise the Mega Panel assembly. The last phase of the Mega Panel assembly – the cladding pan installation – is the most fragile, as its finish is easily damaged. Accordingly, it is only when the entire Mega Panel is finished that the protective film is removed from the ACM pans, and a final quality

11

control and visual inspection is conducted to make sure each Mega Panel meets the quality and finish expectations established during the approval of the Visual Mock-Up.

49.     On September 28, 2016, ISLAND completed fabrication and assembly of the first Mega Panel for use at the Project.

50.     On September 28, 2016, and upon removal of the factory-applied protective film affixed to the sheets by MITSUBISHI, inconsistencies, streaking, and other deficiencies of the finish were observed by ISLAND personnel, which were not consistent in color, finish, or quality with the Project Specification, samples and Sample Sheets.

51.     Upon removal of the protective film as applied by MITSUBISHI on September 28, 2016, ISLAND personnel observed significant and material differences between those materials and (a) the samples provided by MITSUBISHI that were approved by the Project Architect in or about October 2015, and (b) the Sample Sheets provided by MITSUBISHI for use in the large-scale Visual Mock Up approved by the Project Architect on or about November 12, 2015.

52.     Additionally, visual inspection, subsequently confirmed by physical testing, revealed that the sheets delivered by MITSUBISHI utilized a different gloss than that used in the samples and Sample Sheets.

53.     Additionally, visual inspection, subsequently confirmed by physical testing, revealed a distinct differences in the clear coat of the sheets, most likely attributable to a change in the thermal process in production utilized by MITSUBISHI for the sheets.

54.     Additionally, upon information and belief, MITSUBISHI did not deliver the product ordered by EASTERN and specified in the Purchase Orders. Specifically, the Bronze

sheets supplied by MITSUBISHI had a "Mica" basecoat paint, rather than the "Metallic" basecoat paint specified in the Purchase Orders and specifically purchased by EASTERN.

55.     As such, it was evident and readily observable that MITSUBISHI failed to deliver materials that (a) were specified in the Purchase Orders, (b) conformed to the specifications issued by the Project Architect, and (c) were of like kind and quality as the samples and Sample Sheets reviewed and approved by the Project Architect prior to the parties making the agreement.

56.     At all times heretofore mentioned, both EASTERN and ISLAND acted in a timely, responsible, and commercially reasonable manner.

57.     On September 29, 2016, and on multiple occasions thereafter, EASTERN and ISLAND notified MITSUBISHI that the materials were nonconforming, defective, and of inconsistent kind and quality to those supplied as samples, and the Sample Sheets supplied and utilized in the Visual Mock Up, which had been approved and accepted by the Project Architect.

58.     On October 4, 2016, several representatives of MITSUBISHI inspected the nonconforming materials at ISLAND's facility.

59.     On or after October 4, 2016, MITSUBISHI disclaimed the existence of any material defect in the nonconforming materials.

60.     On October 11, 2016, EASTERN and ISLAND notified MITSUBISHI of rejections by the Project Architect, Project Owner, Owner Consultant, and Nickel and supplied it with copies of all correspondence from those persons/entities. (Correspondence annexed hereto as Exhibit K) Additionally, ISLAND further demanded that MITSUBISHI replace all of the nonconforming and defective sheets.

61.    On October 14, 2016 and October 17, 2016, representatives of Project Ownership, the Project Architect, the Project Client, Nickel, and the Owner's consultant inspected the nonconforming materials at ISLAND's facility.

62.    MITSUBISHI was invited to attend the October 14, 2016 inspection, but declined to participate. (E-Mail correspondence between ISLAND and MITSUBISHI annexed hereto as Exhibit L)

63.    On visual observation of the panels in various conditions on October 14, 2016, the Project Owner confirmed the existence of the deficiencies in the sheets as observed and reported by ISLAND personnel, and rejected them as unsuitable for the Project.

64.    Through correspondence dated October 17, 2016, the Project Owner confirmed the rejection of the sheets for the Project, stating the defects observed constituted evidence of a defective manufacturing process. (Correspondence annexed hereto and incorporated herewith as Exhibit M)

65.    Upon visual observation of the panels in various conditions on October 17, 2016, the Project Architect confirmed the existence of the deficiencies in the panels as observed and reported by ISLAND personnel, and rejected them as unsuitable for use at the Project.

66.    Through correspondence dated October 18, 2016, the Project Architect reiterated his rejection of the Mitsubishi ALPOLIC® sheets, noting obvious streaking and uneven sheen throughout as evidence of substandard finish quality. (Correspondence annexed hereto and incorporated herewith as Exhibit N)

67.    Upon visual observation of the panels in various conditions on October 17, 2016, the Owner's Consultant confirmed the existence of the deficiencies in the sheets as observed and reported by ISLAND personnel, and rejected them as unsuitable for the Project.

68. Through correspondence dated October 19, 2016, the Owner's Consultant rejected the sheets as unsuitable for the Project, stating that inconsistencies in the sheen of the clear topcoat caused vertical streaking, which, significantly, was not present in the Visual Mock Up. (Correspondence annexed hereto and incorporated herewith as Exhibit O)

69. On visual observation of the panels under various conditions on October 14, 2016, Nickel confirmed the existence of the deficiencies in the sheets as observed and reported by ISLAND personnel and rejected them as unsuitable for the Project.

70. Through e-mail correspondence on October 12, 2016, MITSUBISHI refused ISLAND'S request to replace the nonconforming and defective materials.

71. Thereafter, plaintiffs took commercially reasonable measures to secure an alternative supply of project materials from alternative manufacturers so as to attempt to minimize its damages and adhere to the production schedule with the Project Owner. To wit, Plaintiffs moved quickly after MITSUBISHI's breach and refusal to remedy the nonconforming and defective sheets to secure an alternative source of ACM sheets from supplier Vitrabond, but at a total cost of $612,000.00 ($3.60 x 170,000 sq. ft.), or $17,000.00 more than the cost of the materials to have been provided by MITSUBISHI, and on top of the approximately $172,000.00 ($163,187.00 + approx. $9,000.00 for the Visual Mock Up sheets) that EASTERN had already paid to date.

72. By reason of MITSUBISHI's failure to supply conforming materials in a manner consistent with MITSUBISHI's contractual and professional obligations, EASTERN and ISLAND have been damaged in the amount of $163,187.00, that being the monies paid by EASTERN and ISLAND for the nonconforming and defective materials.

73.    By reason of MITSUBISHI's failure to supply conforming materials in a manner consistent with MITSUBISHI's contractual and professional obligations, ISLAND lacked the necessary components to allow it to fabricate its panels in a timely manner and in compliance with its contractual obligations to Nickel.

74.    By reason of MITSUBISHI's failure to supply conforming materials in a manner consistent with MITSUBISHI's contractual and professional obligations, ISLAND was required to initiate an immediate recovery and risk mitigation program to avoid breaching its obligations and incurring substantial liability under the Subcontractor Agreement with Nickel.

75.    By reason of MITSUBISHI's breach of contract, and breach of warranty, EASTERN has sustained and continues to sustain additional and foreseeable costs and expenses, including but not limited to: lost operational expenses due to underutilization of plant and operational capacities; extended project specific overhead expenses; costs associated with repeated production stops and re-starts and including; labor, equipment, and safety coordination costs and other expenses resulting from out of sequence work and demobilization and remobilization; engineering and labor replacement costs; material costs; project schedule recovery and damage mitigation costs.

76.    By reason of MITSUBISHI's breach of contract, and breach of warranty, ISLAND has sustained and continues to sustain additional and foreseeable costs and expenses, including but not limited to: lost operational expenses due to underutilization of plant and operational capacities; extended project specific overhead expenses; costs associated with repeated production stops and re-starts and including; labor, equipment, and safety coordination costs and other expenses resulting from out of sequence work and demobilization and

16

remobilization; engineering and labor replacement costs; project schedule recovery and damage mitigation costs.

77.     The extent of Plaintiffs' consequential damages can be calculated with reasonable certainty, and is presently calculated to be in excess of $6,758,133.23.

78.     The direct cost incurred by Plaintiffs, as the result of MITSUBISHI's breach, for the removal of the nonconforming and defective MITSUBISHI ACM sheets from the assembled Mega Panels was $165,521.64, which cost includes (a) unloading the finished and packaged Mega Panels that used the nonconforming and defective ACM sheets from the trailers and back to the fabrication floor; (b) removing both finished and unfinished Mega Panels from cradles and moving to the fabrication floor; moving unfinished Mega Panels into temporary storage, in upright positions, to prevent damage as plaintiffs awaited replacement ACM sheets; removing the nonconforming and defective ACM sheets from the finished Mega Panels, and reinstalling new ACM on the previously finished Mega Panels; reloading the Mega Panels onto cradles, and then onto trailers; and labor costs associated with the supervisor, foreman, quality control, trucking and clean-up personnel required.

79.     The cost incurred by plaintiffs, as the result of MITSUBISHI's breach, for the re-cutting, re-folding and fabrication of the replacement ACM sheets was $416,088.00, which cost includes (a) re-routing/re-cutting of the replacement ACM sheets; (b) re-folding the replacement ACM sheets; (c) transporting the replacement sheets to the fabrication and assembly facility; and the labor costs associated with the supervisor, foreman, quality control, trucking, clean-up, and engineering personnel (who had to re-program computerized cutting machines) required.

80.     The materials replacement cost incurred by plaintiffs, as the result of MITSUBISHI's breach, was approximately $240,298.27. Replacement ACM sheets were

secured from supplier Vitrabond at a total cost of $612,000.00, calculated at $3.60 x 170,000 sq. ft., or $17,000.00 more than the cost of the materials that were to have been supplied by MITSUBISHI. Additionally, replacement rivets, extrusions, glue, and other consumables that could not be reused after the disassembly of the Mega Panels using the nonconforming and defective MITSUBISHI sheets were purchased at an additional cost of $51,298.27. These costs are on top of the $172,000.00 that plaintiffs paid to MITSUBISHI for the nonconforming and defective sheets.

81.     Plaintiffs' lost revenue attributable to MITSUBISHI's breach, and the resulting seven month delay occasioned by same, are calculated to be at or in excess of $645,120.00.

82.     The additional fixed costs incurred by plaintiffs, as the result of MITSUBISHI's breach, and the resulting seven month delay occasioned by same, are calculated to be at or in excess of $1,413,522.21.

83.     Further, because of the seven month delay that was occasioned by MITSUBISHI's breach, plaintiffs incurred significant costs in demobilizing, and remobilizing, its ACM and fabrication facilities, i.e., moving and storing materials and equipment that could not be used until replacement ACM sheets were secured, and then moving materials and equipment back into the facilities when fabrication could resume. These costs are calculated to be at or in excess of $223,450.24.

84.     Further, the attendant cost to moving and storing the Mega Panel "frames," each weighing approximately 3000-4000 lbs, during the seven month delay that was occasioned by MITSUBISHI's breach, is calculated to be at or in excess of $161,815.36.

85.     Further, the efficiency penalty and cost occasioned by having to simultaneously work on multiple projects due to MITSUBISHI's breach is calculated to be at or in excess of

$1,515,911.28. Island's fabrication and assembly facilities are "booked" months in advance, and operate on tightly controlled schedules and deadlines. In order to choreograph and coordinate the various tasks required to timely complete multiple complex projects, it is critical that materials arrive in a timely manner. As noted in the preceding paragraphs, any disruption in this tightly controlled schedule creates a domino effect, impacting numerous other concurrent or subsequent projects and causing increased costs in transportation and storage of these Mega Panels (unwieldy, and weighing thousands of pounds) and associated materials while awaiting the replacement materials necessary for completion.

86.     The labor overtime cost associated with MITSUBISHI's breach, and the resulting labor hours required to maintain project schedules on multiple projects, is calculated to be at or in excess of $1,048,832.00.

87.     Finally, the increased general liability insurance cost attendant to MITSUBISHI's breach is calculated to be at or in excess of $582,539.22.

88.     By virtue of the foregoing, EASTERN and ISLAND have incurred substantial damages in an amount which is presently increasing but believed to be in excess of $6,758,133.23 due to MITSUBISHI's breach of contract, and breach of warranty.

### AS AND FOR A FIRST CAUSE OF ACTION
### BREACH OF CONTRACT

89.     Plaintiffs repeat, reiterate and reallege each and every allegation set forth above, inclusive, with the same force and effect as though more fully set forth at length herein.

90.     Plaintiffs relied on MITSUBISHI's expertise and knowledge of its products to provide materials that were in accordance with the specifications for the Project, that were consistent with the samples and Sample Sheets provided to, inspected by, and approved by

EASTERN and the Project Architect prior to purchase, and that were in accordance with good and accepted industry practices.

91.     MITSUBISHI entered into a contract with EASTERN to supply certain materials and materials, known and referred to as ACM sheets, which contract is evidenced by Purchase Orders dated June 1, 2016, the material terms of which are as follows:

> A.  Purchase Order 0601-0423 M, which calls for MITSUBISHI's delivery of the quantiy of 456 "4mm FR Core ACM sheets – 439Z6258M (Kynar) Fluropon 11263 Metallic 4301307 basecoat, referred to as ALPOLIC® Anodized **BRONZE** 3-coat metallic Valspar finish" at $3.50/sq. ft., deliverable on June 16, 2016, July 16, 2016, September 1, 2016, and November 1, 2016; and
>
> B.  Purchase Order 0601-1206 M, which calls for MITSUBISHI's delivery of the quantity of 2,915 "4mm FR Core ACM sheets – 439Z6254M (Kynar) Fluropon 11262 Metallic 430A307 basecoat, referred to as ALPOLIC® Anodized **BLACK** 3-coat metallic Valspar finish" at $3.50/sq. ft., deliverable on June 16, 2016, September 1, 2016, and November 1, 2016.

92.     The total agreed-upon price for the Project Materials, as evidenced by the Purchase Orders, was $575,986.58.

93.     MITSUBISHI duly accepted the terms of the contract, as evidenced by the Purchase Orders, by its partial performance on same, *to wit*, it commenced delivery of the Project Materials to EASTERN pursuant to the agreed-upon delivery schedule commencing in July, 2016.

94.     MITSUBISHI duly accepted the terms of the contract, as evidenced by its invoicing of Project Materials upon delivery to EASTERN.

95.     EASTERN duly and fully performed its obligations under the parties' contract, as evidenced by the Purchase Orders, by remitting payments to MITSUBISHI for Project Materials as delivered, which payments totaled $163,187.00.

96.     By virtue of the foregoing payments, EASTERN fulfilled all of its obligations under the aforementioned contract, including the payment to MITSUBISHI of $163,187.00 as invoiced by MITSUBISHI.

97.     MITSUBISHI breached its contract with EASTERN by failing to provide the goods and materials specified in the June 1, 2016 Purchase Orders, *to wit*, EASTERN ordered ALPOLIC® Anodized **BRONZE** ACM sheets with a "Metallic" basecoat, but MITSUBISHI delivered ALPOLIC® Anodized **BRONZE** ACM sheets with a "Mica" basecoat.

98.     MITSUBISHI breached its contract with EASTERN by failing to provide goods and materials that were conforming, acceptable, and in accordance with the project specifications, the samples, and the Sample Sheets previously provided to, inspected by, and approved by EASTERN and the Project Architect prior to purchase.

99.     MITSUBISHI breached its contract with Eastern by delivering Sheets that utilized a different gloss than that used in the samples and Sample Sheets previously provided and approved.

100.     MITSUBISHI breached its contract with Eastern by altering the thermal process in its production of the ACM sheets, which resulted in distinct differences in the clear coat of the Sheets from the samples and Sample Sheets previously provided and approved.

101.     MITSUBISHI breached its contract with Eastern by providing materials with obvious streaking and uneven sheen throughout, and materials demonstrating substandard finish quality.

21

102.    Additionally, MITSUBISHI breached its contract with EASTERN by failing to act in accordance with general good practices and industry expectations, and as otherwise understood between EASTERN and MITSUBISHI, by timely replacing and/or repairing its defective, non-conforming materials.

103.    MITSUBISH breached its contract with EASTERN by supplying materials that were rejected by Project Ownership, Project Architect, Owner's Consultant, and Nickel.

104.    EASTERN and/or ISLAND rightfully and timely rejected the nonconforming materials provided by MITSUBISHI, and/or justifiably and timely revoked its/their acceptance of the nonconforming materials provided by MITSUBISHI.

105.    On September 28, 2016, EASTERN provided MITSUBISHI with written notice of its breach of the parties' contract, and provided MITSUBISHI with a reasonable opportunity to inspect the Sheets and cure the defect.

106.    MITSUBISHI's breach of contract, directly and proximately caused the substantial damages incurred by EASTERN and has damaged EASTERN in an amount which is presently increasing but believed to be in excess of $6,758,133.23.

**AS AND FOR A SECOND CAUSE OF ACTION
FOR BREACH OF WARRANTY**

107.    Plaintiffs repeat, reiterate and reallege each and every allegation set forth above, inclusive, with the same force and effect as though more fully set forth at length herein.

108.    The Project Materials were subject to MITSUBISHI's 30-year warranty (the "Warranty") (a copy of which is annexed as Exhibit P) (*see also* Exhibit C).

109.    Pursuant Sections A and B of the Warranty, MITSUBISHI warranted, *inter alia*, that the coating applied by MITSUBISHI will not:

A. Peel, check or crack except for such slight crazing or cracking as may occur on tightly roll-formed edges or brake bends at the time of forming pre-painted sheets, which is accepted as standard; or

B. (1)    Chalk in excess of a numerical rating of **8** measured in accordance with the standard procedures as outlined by the "Standard Methods of Evaluation Degree of Chalking of Exterior Paint" ASTM D4214-89; or

(2)    Fade or change in color in excess of **5** color difference units, using ASTM D2244-89 measured on the exposed painted surfaces which have been cleaned of external deposits and chalk and the corresponding values measured on the original or unexposed painted surfaces, it being understood that fading or color changes may not be uniform if the surface is not evenly exposed to the sun and elements;

and that gloss (60° incident angle) loss will not exceed 40% when measured or exposed painted surfaces which have been cleaned of external deposits and the corresponding values measured on unexposed painted surfaces. The gloss shall be measured using standard procedures as defined by "Standard Method for Specular Gloss", ASTM D523-89.

110.    Pursuant to Section G of the Warranty, "claims under the warranty must be made to [MITSUBISHI] in writing within thirty (30) days after discovery of the defective coating and [MITSUBISHI] must be given a reasonable opportunity to inspect the coated metal claimed to be defective."

111.    Pursuant to its terms, the Warranty period began on the date of shipment, and continued for thirty years plus one day from date of shipment.

112.    The Project Materials were delivered to EASTERN by MITSUBISHI in multiple shipments beginning in July, 2016, and the Warranty period for each shipment received remains in effect because thirty years plus one day has not yet lapsed since July, 2016.

113.    Prior to its placement of the Purchase Orders, EASTERN reviewed the warranty, and in placing the orders, EASTERN relied on the express terms of the warranty.

114.    EASTERN duly notified MITSUBISHI of the observed defects to MITSUBISHI within thirty days after discovery, and MITSUBISHI was given a reasonable opportunity to inspect the Panels.

115.    Moreover, pursuant to Section I of the Warranty, EASTERN maintained the Sample Sheets to facilitate MITSUBISHI's comparison of the nonconforming and defective Panels to the Sample Sheets.

116.    MITSUBISHI breached its Warranty with EASTERN when it supplied goods and materials that were nonconforming and defective and not consistent with the kind and quality of the samples and Sample Sheets, and thereafter failed to replace same upon receipt of notice of the defects.

117.    MITSUBISHI further breached the express warranty when it violated Sections (A)-(B)(1)-(2) of the warranty.

118.    That the defendant, MITSUBISHI, breached express and implied warranties, including but not limited to the breach of implied warranties as to merchantability and fitness for a particular purpose as set out in the Uniform Commercial Code. Said breach or breaches were a cause or a proximate cause of the injuries, and damages set forth herein.

119.    As detailed above, MITSUBISHI's breach of the express and implied warranties directly and proximately caused substantial damages to EASTERN and ISLAND in an amount which is presently increasing, but believed to be in excess of $6,758,133.23.

WHEREFORE, the plaintiffs, EASTERN and ISLAND demand judgment against the defendant, MITSUBISHI as follows:

A.  On the first cause of action in an amount to be determined at trial but believed to be in the amount of at least $6,758,133.23;

24

B.  On the second cause of action in the amount in an amount to be determined at trial but believed to be at least $6,758,133.23;

C.  and that they be awarded interest, costs, expenses, and attorney's fees incurred in connection with the prosecution of this action, and for such other and further relief as this Court deems just, proper and equitable.

Dated:  Islandia, New York
       October 18, 2017

/s/Bryan F. Lewis, Esq.
Bryan F. Lewis, Esq.
*Attorneys for Plaintiffs*
LEWIS JOHS AVALLONE AVILES, LLP
One CA Plaza, Suite 225
Islandia, NY 11749
(631) 755-0101